**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANTS:

**ROBERT W. MYSLIWIEC**
South Bend, Indiana

ATTORNEY FOR APPELLEES:

**DONALD E. WERTHEIMER**
South Bend, Indiana

**FILED**

Dec 11 2012, 9:14 am

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

GARLAND ASCHENBRENNER, WINIFRED )
ASCHENBRENNER, and SOUTH BEND )
CARPETLAND USA, INC. d/b/a ABBEY )
CARPETS AND FLOORS, )
)
    Appellants-Defendants, )
)
        vs. )    No. 71A04-1201-PL-96
)
MELVIN H. SANDOCK INTER VIVOS )
REVOCABLE TRUST, BETTY J. SANDOCK )
INTER VIVOS REVOCABLE TRUST, MELVIN )
H. SANDOCK, BETTY J. SANDOCK, and )
RUBY SANDOCK, )
)
    Appellees-Plaintiffs. )

APPEAL FROM THE ST. JOSEPH CIRCUIT COURT
The Honorable Michael G. Gotsch, Judge
Cause No. 71C01-0712-PL-317

**December 11, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Garland Aschenbrenner ("Chip"), Winifred Aschenbrenner (together, "the Aschenbrenners"), and South Bend Carpetland USA, Inc. d/b/a Abbey Carpets and Floors ("South Bend Carpetland") (collectively, "Carpetland") appeal the trial court's order granting judgment in favor of the Melvin H. Sandock Inter Vivos Revocable Trust, the Betty J. Sandock Inter Vivos Revocable Trust, Melvin H. Sandock, Betty J. Sandock, and Ruby Sandock (collectively, "Sandock") and awarding damages in the amount of $180,183.11 plus attorney fees. Carpetland raises several issues, which we consolidate and restate as: whether the trial court's judgment was contrary to law.

We vacate and remand with instructions.

## FACTS AND PROCEDURAL HISTORY

This case involves a dispute between the landlord, Sandock, and tenant, Carpetland, of a commercial building located at 50760-50770 U.S. 31/33 North (now State Road 933 North) in South Bend, Indiana ("the property"), which is located in St. Joseph County. Sandock as lessor entered into a lease with Carpetland as lessee for the premises with a term running from March 1, 2000 until May 31, 2010 ("the 2000 lease"). This lease was a renewal of a lease executed between the parties in 1985 ("the 1985 lease"). The 1985 lease contained a guaranty signed by the Aschenbrenners, by which they guaranteed the performance of the obligations of the Lessee, South Bend Carpetland, for a period of three years beginning March 1, 1985 and terminating February 28, 1988. *Def't's Ex*. I at 16. The Aschenbrenners were also guarantors on the 2000 lease. Both the 1985 lease and the 2000

lease required Carpetland to obtain insurance and pay the premiums for fire and extended

coverage on the property.

Pertinent provisions of the 2000 lease stated:

5.      . . . Copies of said insurance policies or certificates of insurance insuring the interests of both the Lessor and Lessee shall be deposited with the Lessor upon the issuance of said insurance. . . .

6.      . . . On termination of this lease, Lessee will yield up the Demised Premises to Lessor in substantially as good condition and repair as at present, normal wear, tear, and depreciation excepted, and any and all improvements and changes made to the building or premises shall remain intact and become the property of the Lessor.  On termination of this lease, Lessee will yield to Lessor with the Demised Premises any and all improvements, changes, or betterments to the property which may be affixed to the property during the term of the lease, including but not limited to any walls, wall coverings, lighting, facades, reinforcements, and attached carpeting. . . .

. . . .

8.      Lessor and Lessee covenant that and [sic] any work to be performed by the Lessee at the Demised Premises shall be performed and completed in a good and workmanlike manner and in full compliance with all provisions of all governmental authorities having jurisdiction over such construction and work. . . .

. . . .

11.     Lessor shall not be liable for any damage occasioned by failure to keep the Demised Premises in repair nor for any damage done or occasioned by or from plumbing, gas, water, steam, or other pipes or sewage, or the bursting, leaking, or running over of any tank, water plant, water closet, or waste pipe, in, above, upon, or about said buildings, or premises, nor for damage occasioned by water, snow, or ice being upon or coming through the roof, skylights, trap doors, or otherwise, nor from damages arising from acts or neglect of any owners or occupants of adjacent or contiguous property. . . .

12.      . . . Lessee hereby agrees to pay Lessor the expenses incurred by Lessor, including reasonable attorney fees, and to pay for such other expenses as Lessor may incur, putting said premises in good repair and condition, and the costs of any reasonable alterations and additions that Lessor may deem advisable for the re-letting of said premises; also any other expenses or commissions paid by Lessor in re-letting said premises. . . .

. . . .

14.      . . . In the event of any destruction or damage to the Demised Premises not resulting in the termination of the term of this Lease as hereinabove provided, the Demised Premises shall be promptly repaired by the Lessor with the insurance proceeds . . . .

*Appellants' App.* at 8-13.

Prior to the 1985 lease between the parties, the property was used as a retail carpet and floor covering business by Sandock. When Sandock decided to terminate the business in 1985, a new tenant was located, South Bend Carpetland USA, Inc., which was a carpet franchise company owned and operated by Chip. In 1985, Carpetland entered into the 1985 lease with an initial term of seven-and-a-half years and with the potential for renewal. Carpetland's occupancy of the property under the 1985 lease began in January 1985, at which time Carpetland undertook significant renovations to prepare the property for opening. Under the 1985 lease, there was a provision requiring Carpetland to install a new roof on the building. In 1989, Carpetland installed a new flat roof on part of the building ("the rubber roof"); the remainder of the building, known as the warehouse, had a pitched metal roof. The rubber roof was installed by All Weather Exteriors, Inc. and carried a ten-year warranty. All Weather Exteriors, Inc. went out of business a few months after the rubber roof was installed.

4

Sandock became concerned about maintenance and repairs on the rubber roof in 1991 or sometime shortly thereafter. Throughout the decade of the 90s, there were leaks in the rubber roof that were resolved by Carpetland by "patching," rather than more permanent and extensive repairs. *Tr.* at 149. Carpetland utilized unskilled contractors for the roof repairs, and no permits were ever taken out for the work done. Carpetland made no claim under the warranty for the rubber roof.

During the term of the 2000 lease, Carpetland made several claims under the casualty insurance policies that covered the property. The first claim arose from a tornado that occurred in St. Joseph County on October 24, 2001, which damaged the property. The second and third claims arose in 2003 and April 12, 2007, respectively. The first two claims were presented to Citizens Insurance Company a/k/a Hanover Insurance Company; the third claim was presented to Harleysville Insurance Company. Carpetland collected a total of $62,893.11 from the insurance carriers. The claims pertained to damage to both the rubber and metal roofs, gutters, overhead doors, fencing, and other items in the interior and exterior of the building. The money expended to make repairs to the property was less than the amount of insurance proceeds collected by Carpetland. The commencement of many of the repairs to the property was delayed, and there were long delays in completing such repairs. Much of the repair work and the insurance repairs required permits from the St. Joseph County Building Department since the work undertaken exceeded $500.00, but no permits were taken out by Carpetland or any of the workers used to make such repairs.

5

At the commencement of the 2000 lease, the floor covering in the property consisted of Armstrong black tile, which had been installed by Carpetland in 1985. In July 2000, Carpetland, who had previously been a franchisee for Carpetland USA, signed a new franchise agreement and became an Abbey Carpet franchisee. At the suggestion of Abbey Carpet, Carpetland spent an additional $60,000.00 to $70,000.00 to remodel the interior of the store and install new carpeting in the showroom. The carpeting recommended by Abbey Carpet was teal, shag, residential carpet, which the company felt coordinated well with its carpeting displays. The carpeting was installed using a process where it actually "floats" over the tile floor, i.e., padding was laid on the floor, and the carpet was stretched over the top of the padding. *Tr.* at 959. No part of the carpet or padding was glued to the floor. Replacement carpet was installed on or about May 22, 2010 in the showroom area of the property.

On December 31, 2007, Sandock filed a complaint against Carpetland, alleging that during the term of the leases Carpetland had received checks from insurance companies for casualty losses, that the insurance proceeds were not properly used to restore the property to its pre-loss condition, and that the insurance checks should have been payable to Sandock so Sandock could ensure that the disbursements were properly made for repairs to the property. On February 17, 2009, Sandock filed an amended complaint, adding a second count, which alleged that the rubber roof was in need of replacement, and that under the 2000 lease, it was Carpetland's responsibility to replace the rubber roof. On February 25, 2009, Carpetland filed a motion to dismiss the amended complaint, and on April 16, 2009, the trial court issued

6

an order granting the motion to dismiss and allowing for Sandock to only file amendments to the complaint with leave from the court. On June 29, 2009, after receiving leave from the trial court to file another amended complaint, Sandock filed its third amended complaint, which contained two counts, the first reiterating the claim concerning the insurance proceeds, and the second, alleging that Carpetland failed to properly maintain the rubber roof, causing it now to be prematurely in need of replacement.

Carpetland filed a motion for summary judgment, and after a hearing, the trial court granted partial summary judgment as to the portion of Sandock's claim that insurance checks had been forged or otherwise improperly secured by Carpetland, but denied summary judgment as to the claims concerning the handling of the insurance proceeds and the roof maintenance. The case proceeded to trial on these issues. On June 13, 2011, the trial court entered its findings of fact, conclusions of law, and judgment, awarding Sandock $180,183.11 in damages. The trial court also found that, pursuant to the 2000 lease, Sandock was entitled to reasonable attorney fees and costs. On December 21, 2011, the trial court entered an order awarding Sandock $72,037.50 in attorney fees and costs. Carpetland now appeals. Additional facts will be added as necessary.

### DISUSSION AND DECISION

When a trial court enters findings of fact and conclusions thereon, we apply the following two-tiered standard of review: (1) whether the evidence supports the findings; and (2) whether the findings support the judgment. *Fields v. Conforti,* 868 N.E.2d 507, 512 (Ind. Ct. App. 2007); *Clark v. Crowe*, 778 N.E.2d 835, 839 (Ind. Ct. App. 2002). We will set aside

7

the trial court's findings and conclusions only if they are clearly erroneous. *Fields,* 868 N.E.2d at 512; *Clark,* 778 N.E.2d at 840. Findings are clearly erroneous when the record contains no facts to support them directly or by inference. *Fields,* 868 N.E.2d at 512. A judgment is clearly erroneous if the trial court's conclusions do not support the judgment. *Quillen v. Quillen,* 671 N.E.2d 98, 102 (Ind. 1996). "We give due regard to the trial court's ability to assess the credibility of witnesses." *Fields,* 868 N.E.2d at 512. We do not reweigh the evidence, and we consider the evidence most favorable to the judgment and all reasonable inferences drawn therefrom. *Id.* (citing *Yoon v. Yoon,* 711 N.E.2d 1265, 1268 (Ind. 1999)).

Carpetland argues that the trial court erred in its award of damages to Sandock because such award was not supported by the evidence. We agree. The present case involved a lease between Sandock and South Bend Carpetland, a corporation, for the rent of commercial property. The 2000 lease was not between Sandock and Chip personally; Chip was merely a shareholder and the president of South Bend Carpetland for the duration of the 2000 lease, as well as a guarantor under the 2000 lease.

Corporate officers and shareholders are generally not personally liable for the contractual obligations of the corporation. *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1231 (Ind. 1994) (citing *Toner v. Fulkerson*, 125 Ind. 224, 225, 25 N.E. 218, 219 (1890)). This rule is derived from the fact that a corporation is a legal entity separate and distinct from its shareholders and officers. *Id.* at 1231-32 (citing *Benner-Coryell Lumber Co. v. Ind. Unemploy't Compens. Bd.*, 218 Ind. 20, 25, 29 N.E.2d 776, 778 (1940), *cert. denied,* 312 U.S. 698 (1941); *Clarke Auto Co. v. Fyffe*, 124 Ind. App. 222, 227, 116 N.E.2d 532, 534

(1954)).  This has been so since the earliest days of our corporate law.  *Id*. at 1232.  Although a corporation acts only through its agents, officers, shareholders, and employees, it is the corporate entity that is legally responsible for those acts.  *Id*. (citing *Ind. Dep't of Pub. Welfare v. Chair Lance Serv.,* 523 N.E.2d 1373, 1377 (Ind. 1988)).

Here, there was no claim by Sandock to pierce the corporate veil of South Bend Carpetland, and nothing in the trial court's findings supports such a claim.  Nevertheless, the trial court, in its findings and conclusions, treated South Bend Carpetland, which was the corporation, and Chip, who was the shareholder, officer, and guarantor, as one entity. Throughout its findings and conclusions, the trial court refers to actions that Chip made concerning the property, instead of actions that South Bend Carpetland took regarding the property. The trial court interchangeably referred to South Bend Carpetland and Chip as if they were one and the same when the court discussed the repairs, or lack thereof, done to the property.  However, under the terms of the 1985 lease and the 2000 lease, South Bend Carpetland was the primary obligor and the party subject to the terms of the lease, and not Chip.  Therefore, a conflict exists between the evidence and the trial court's judgment because South Bend Carpetland and Chip do not have the same liability.  The liability of a corporation is not the liability of the individual.  *Winkler*, 638 N.E.2d at 1231.  South Bend Carpetland is still an ongoing, active corporation, separate and distinct from Chip.  It is the entity with liability under the 1985 and 2000 leases.

We note that South Bend Carpetland is continuing to conduct business with new shareholders and officers and is still occupying the property under a new lease.  Chip has no

9

further association with South Bend Carpetland except as guarantor. A guaranty is defined as "a promise to answer for the debt, default, or miscarriage of another person." *S-Mart, Inc. v. Sweetwater Coffee Co., Ltd.*, 744 N.E.2d 580, 585 (Ind. Ct. App. 2001) (citing 38 Am. Jur. 2d Guaranty § 1 (1999)), *trans. denied*. "It 'is an agreement collateral to the debt itself' and represents a 'conditional promise' whereby the guarantor promises to pay only if the principal debtor fails to pay." *Id.* Under Indiana common-law principles, when parties cause a material alteration of an underlying obligation without the consent of the guarantor, the guarantor is discharged from further liability whether the change is to his or her injury or benefit. *Id*. at 586 (citing *Goeke v. Merchants Nat'l Bank & Trust Co. of Indianapolis,* 467 N.E.2d 760, 765 (Ind. Ct. App. 1984), *trans. denied* (1985)). Thus, "[g]uarantors and sureties are exonerated if the creditor by any act, done without their consent, alters the obligation of the principal in any respect or impairs or suspends the remedy for its enforcement." *Id*. (quotations and citation omitted).

In this case, the 2000 lease contained a guaranty, signed by the Aschenbrenners, stating that they were personal guarantors for the performance of the obligations of South Bend Carpetland as the lessee. On October 27, 2010, a supplement to the new lease between Sandock and South Bend Carpetland with its new owners was executed. This supplement stated, "Lessor agrees that any obligation of South Bend Carpetland U.S.A., Inc. now owned by Mark and Elizabeth McCray will not be pursued to the extent the court imposes liability upon the Aschenbrenners and South Bend Carpetland in the above litigation but, rather, will pursue the Aschenbrenners, only, with respect to such or any ruling or order (or judgment)."

10

*Pl.'s Ex*. 95. A plain reading of this agreement may lead to the conclusion that South Bend Carpetland has no obligation under the 2000 lease and that Sandock is releasing the corporation from its obligation under the 2000 lease. "Guarantors and sureties are exonerated if the creditor by any act, done without their consent, alters the obligation of the principal in any respect or impairs or suspends the remedy for its enforcement." *S-Mart, Inc.*, 744 N.E.2d at 586. Therefore, to the extent that this supplement released South Bend Carpetland from liability, it also released Chip and the Aschenbrenners from liability. Although this supplement was admitted at trial as an exhibit and was examined by the trial court, the trial court made no findings concerning it or its effect on liability. The trial court erred when it failed to do so.

Furthermore, the guaranty signed by the Aschenbrenners as part of the 1985 lease guaranteed the performance of the obligations of the Lessee, South Bend Carpetland, for a period of three years beginning March 1, 1985. This guaranty terminated February 28, 1988. *Def't's Ex*. I at 16. Therefore, from the time that guaranty terminated on February 28, 1988 until the 2000 lease took effect, which was March 1, 2000, there was no personal guaranty in effect. The Aschenbrenners cannot be held personally liable for any damages occurring during that period of time.

Carpetland contends that it was error for the trial court to determine whether Sandock suffered any damages by tracing the insurance proceeds. Instead, Carpetland asserts that the proper way to establish whether Sandock suffered any damages regarding the use of the insurance proceeds was to determine whether Carpetland restored the damaged property to a

pre-loss condition after a casualty loss. Carpetland argues that the evidence established that it made repairs to the property such that each item damaged was returned to a pre-loss condition.

Under the 2000 lease, "[o]n termination of the lease, Lessee will yield up the Demised Premises to Lessor in substantially as good condition and repair as at present, normal wear, tear, and depreciation excepted . . . ." *Appellants' App*. at 4. It also states, "[i]n the event of any destruction or damage to the Demised Premises not resulting in the termination of the term of this Lease as hereinabove provided, the Demised Premises shall be promptly repaired by the Lessor with the insurance proceeds . . . ." *Id*. at 7-8. Thus, under the 2000 lease, Carpetland, as the lessee, was only required to return the property to substantially as good condition and repair as when the lease began with normal wear, tear, and depreciation taken into consideration. Nowhere in the lease, was the lessee required to utilize any insurance proceeds obtained to repair damage to the property. In fact, the lease actually contains a provision requiring Sandock, as the lessor, to promptly repair the property with any insurance proceeds obtained when damage occurred. We therefore conclude that the trial court erred in using the amount of insurance proceeds received by Carpetland as the measure of damages. The trial court should have calculated any damages by determining the costs needed to put the property in the same condition as it was at the commencement of the lease, less normal wear, tear, and depreciation.

In conclusion, we find that the trial court erred in its judgment because it treated Carpetland and Chip as if they were the same entity when the lease was actually only

12

between Sandock and Carpetland, which is still an active corporation with new shareholders and still a party to a lease with Sandock. Therefore, the judgment should be against Carpetland, the party to the lease, with the Aschenbrenners only as the personal guarantors if Carpetland fails to pay its debt. Further, the trial court erred when it failed to make any findings concerning the supplement releasing Carpetland, and effectively Chip, from liability and its effect on the judgment. The court also erred in assessing damages against the Aschenbrenners under the 1985 lease for the period during which their guaranty was not in effect. Finally, the trial court erred in its calculation of the damages when it used the amount of insurance proceeds received by Carpetland as the measure of damages. We vacate the trial court's judgment and remand for further proceedings consistent with this opinion.

Vacated and remanded with instructions.

NAJAM, J., and MAY, J., concur.

13